## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 1:23-cr-215 (RDM)** |
| **DOUGLAS STEVEN WYATT,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Douglas Steven Wyatt to 52 months' incarceration, which is the middle of the guideline range—46 to 57 months—calculated by the Probation Office and agreed to by the parties, 3 years of supervised release, the agreed upon $2,000 in restitution, and a mandatory $100 special assessment.

### I. INTRODUCTION

The defendant, Douglas Steven Wyatt, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The

1

The government recommends that the Court sentence Wyatt to 52 months of incarceration, which is within the advisory Guidelines' range of 48-57 months, for Wyatt's conviction under 18 U.S.C. § 111(a)(1) and (b). A 52-month sentence reflects the gravity of Wyatt's criminal conduct and his significant criminal history.

## II.   FACTUAL BACKGROUND

### A.   The January 6, 2021 Attack on the Capitol

The government refers the court to the stipulated Statement of Offense filed in this case, ECF 45, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.   Wyatt's Role in the January 6, 2021 Attack on the Capitol

On January 6, 2021, Wyatt traveled from his residence in Fallston, Maryland to Washington, D.C. to attend the former president's "Stop the Steal" rally and to protest Congress' certification of the Electoral College. ECF 45 at ¶ 8. After attending the rally, Wyatt marched to the U.S. Capitol where a large crowd had gathered to protest Congress' certification of the Electoral College vote. *Id*. at ¶ 10. He was wearing a black and gray hat with yellow lettering, dark sunglasses, a black winter jacket, white (outside) and red (inside) gloves, gray backpack, blue jeans, white and gray tennis shoes, and, occasionally, a black face covering. *Id*. at ¶ 9.

---

Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.



*Image 1: Photograph of Wyatt on January 6, 2021*
*on restricted Capitol grounds*



*Image 2: Screenshot of video footage showing Wyatt (yellow circle) on January 6, 2021*
*on restricted Capitol grounds*

When Wyatt arrived at the U.S. Capitol at approximately 1:30 p.m., a large crowd had

assembled on the restricted grounds surrounding the Capitol building. Wyatt observed that the

3

building was closed to the public and police officers were actively attempting to keep the crowd away from the building. *Id*. at ¶ 10.

Wyatt worked his way to the front of the mob of rioters facing off with police officers on the Northwest Front near construction scaffolding covering a staircase. The staircase provided access to the upper terrace of the Capitol grounds and to the Capitol building.

As the crowd continued to grow on the Northwest Front near the staircase, rioters ripped down bike racks barriers, used munitions against officers, and charged forward through the officer line and up the stairs.



*Image 3: Wyatt (yellow circle) amongst the mob of rioters that battled through the police line to gain access to the Northwest Staircase*

Next to the Northwest Staircase, officers guarded the Capitol by forming a line across the West Front.



*Image 4: Capitol surveillance footage showing an officer line formed across the West Front, with the scaffolding covering the Northwest Staircase out of picture to the immediate right, and the yellow square showing the police line that Wyatt attacked, as described below*

Wyatt again worked his way to the front of the mob. As he faced the police line, Wyatt yelled, among other things: "they're fucking stealing it and you're fucking defending them, man! What the fuck is wrong with ya'll?!" Exhibit 1 at :08-:15. He then yelled, "What the fuck is wrong with you, they're stealing our fuckin' freedom! Right there!" *Id.* at :16-:21. Rioters around him continued to berate officers, calling them traitors and demanding access to the Capitol. Wyatt then turned to rile up other rioters, yelled "1776!," and pointed towards the Capitol.



*Image 5: Photograph of Wyatt (yellow circle) riling up rioters as they confronted the police line on the West Front*



*Image 6: Screenshot of video, Exhibit 1 at :07, showing Wyatt pointing to the Capitol as he berated police officers guarding the Capitol*

A nearby emergency warning system blared that the area around the Capitol was restricted, directed the rioters to immediately disperse, and threatened to arrest those who did not. Officers sprayed aerosolized chemical irritants to disperse the crowd. Despite the warnings and tear gas, Wyatt maintained his position at the front of the mob. Wyatt turned his back towards the officers,

flipped them off with his middle fingers, and repeatedly yelled derogatory terms like, "mother fuckers!" Exhibit 2 at 9:35-9:47.



*Image 7: Screenshot of video footage, Exhibit 2 at 9:35-9:47, showing Wyatt flipping his middle fingers at police officers and yelling at the officers as the officers attempted to keep rioters back*

The rioters continued to face off with the officer line, Wyatt at the forefront.



*Image 8: Screenshot of video footage, Exhibit 8 at 10:18, showing Wyatt (yellow circle) at the front of the pack of rioters as police officers held a line on the West Front, moments before the rioters surged forward and attacked the officer line*

At once, several rioters lunged forward and yanked away a bike rack from the officers. As officers attempted to maintain hold of the bike rack, Wyatt wrapped his arm around the rack and helped pull it away from the officers.



*Image 9: Screenshot of video footage, Exhibit 8 at 10:36, showing police officers struggling to maintain control of the bike rack as Wyatt (yellow circle) pulled it away from the officers*

With Wyatt's assistance, the rioters gained control of the bike rack and passed it back into the crowd, creating a vulnerability in the police line. Wyatt stayed at the front of the line, pointing and yelling at officers as rioters standing next to him continued to yank away other bike racks from the officers. Exhibit 8 at 11:10-11:15.



*Image 10: Screenshot of video footage, Exhibit 8 at 11:12, showing Wyatt (yellow circle) pointing and yelling at police officers as nearby rioters pull away bike racks from the police line*

As violent confrontations continued, officers continued to deploy chemical irritants toward the crowd. Several other rioters stepped back, but Wyatt did not. Instead, Wyatt bent over and picked a long 4"x4" wooden plank off the ground and handed it to his co-defendant, Jacob Therres. Therres took the wooden plank and hurled it at the police line, striking U.S. Capitol Police Officer J.W. in the head and causing him to briefly lose consciousness.[2]

---

[2] Officer J.W. has continued to experience concussion symptoms following January 6, 2021. *See* ECF No. 35 at 7-8, 10-11.



*Image 11: Screenshot of video footage, Exhibit 8 at 11:20, showing Wyatt (yellow circle) picking up a wooden plank from the ground*



*Image 12: Screenshot of video footage, Exhibit 8 at 11:23, showing Wyatt (yellow circle) handing the wooden plank to co-defendant Therres*



*Images 13 & 14: Screenshots of video footage, Exhibit 8 at 11:18-:30, showing Therres (yellow circle) after he threw the wooden plank (yellow rectangle) at the officers*

Moments later, rioters at the front of the crowd near Wyatt collectively rushed the police line, and violence erupted. Rioters engaged in hand-to-hand combat with officers, using their bodies and hard objects – like batons and a metal chair – to attack officers. *See* Exhibit 3 at 23:35-24:00.

11



*Image 15: Screenshot of video footage, Exhibit 3 at 23:45, showing Wyatt (yellow circle) at the front of the mob facing the officer line as rioters surged forward towards the officers, and other rioters threw objects, like the metal chair mid-air, at the officer line*



*Image 16: Screenshot of video footage, Exhibit 4 at :22-:32, showing Wyatt (yellow circle) surging forward towards the officers as the mob broke through the police line*

After having actively defended their line on the West Front for over an hour, the hundreds of officers at the front of the inauguration stage were flanked, outnumbered, and under continuous assault from the thousands of rioters – Wyatt included – directly in front of them. With their

situation untenable, the officers attempted to retreat to safety as Wyatt and his fellow rioters flooded the West Plaza. *See* Exhibit 4 at :22-:32.

Wyatt and Therres charged forward towards the center stage. As Wyatt approached the inaugural stage, he rustled through a black Metropolitan Police Department (MPD) crowd control duffle bag and stole a chemical spray gun from the bag.



*Image 17: Screenshot of video footage, Exhibit 8 at 17:27, showing Wyatt (yellow circle)*
*bending towards the MPD duffle bags and stealing the chemical sprayer*

On the stage around him, rioters continued to battle the now dispersed line of officers. One officer leaned over a ledge to assist his fellow officers who were fending off a rioter's attack. A nearby rioter charged at the officer, knocking him over the ledge. Exhibit 6 at :36-:42. Meanwhile, Wyatt used the stolen chemical spray gun to fire oleoresin capsicum aerosol ("OC spray")[3] at the officers. Exhibit 6 at :39.

---

[3] The oleoresin capsicum (OC) aerosol had a capsaicin concentration level of 0.2% to 1.3%.



*Image 18: Screenshot of video footage, Exhibit 6 at :39, showing Wyatt (yellow circle) aiming the sprayer gun towards officers as another rioter (red circle) pushed an officer over a ledge*

As rioters continued to attack the officers, Wyatt sprayed them at close range for several more seconds. Exhibit 6 at :42-:48.



*Image 19: Screenshot of video footage, Exhibit 6 at :46, showing Wyatt firing OC spray at officers standing on the ledge below*



*Image 20: Close up screenshot of video footage, Exhibit 6, showing Wyatt firing OC spray at police officers*

By this point, officers were retreating towards a temporary staircase on the Southwest side of West Front, which led to the Lower West Terrace. Wyatt followed.

15



*Image 21: Screenshot of body worn camera footage, Exhibit 7 at 37:28, showing Wyatt approaching the Southwest corner of the West Terrace where rioters cornered the officers*

The officers were in a precarious position – cornered with a wall at their back and an angry mob at their front. Their only escape was the narrow staircase. Some officers fended off rioters as other officers escaped up the staircase. Rioters threw objects at the now-cornered group of officers. Wyatt approached these officers with other rioters who yelled, "BACK UP!" (Exhibit 5 at 49:10) and "STAND DOWN!" *See* Exhibit 7 at 36:45-36:55. Wyatt stood at the front of the mob, phone in the air, as he faced off with the officers.



*Image 22: Screenshot of video footage, Exhibit 5 at 47:46, showing Wyatt (yellow sqaure) facing off with officers as they attempted to retreat up the staircase to safety*



*Image 23: Screenshot of video footage, Exhibit 5 at 1:26, showing Wyatt (yellow circle) facing off with a police line as the now cornered officers attempted to retreat up the staircase*

After the police officers retreated up the staircase, Wyatt and other rioters followed. Wyatt

worked his way towards the center of the Capitol building and watched as other rioters bashed

through a window and climbed into the Capitol. As chaos continued around him, Wyatt and others

straddled part of the inaugural stage where rioters hung a large "TRUMP 2020" flag.



*Image 19: Photograph showing Wyatt (yellow square) straddling the inaugural stage*
*over a TRUMP 2020 flag admist chaos on the West Front*

*Wyatt's Interview*

Pursuant to his plea agreement, Wyatt participated in a post-plea interview with the FBI.

In the interview, Wyatt explained that he traveled to Washington, D.C. because he believed it was

important to support elected officials in Congress and he knew Congress was meeting that day.

Wyatt was familiar with the lawsuits challenging the election results and he kept apprised of the

investigations into fraud regarding the presidential election, because he believed there was fraud

in the election.

When he arrived at the Capitol grounds, Wyatt saw bike racks scattered on the ground. He

took note of how people were dressed – in vests, gas masks, and tactical gloves. He saw police

officers firing rubber bullets. Rioters around him yelled things like, "we're going to change the

world." Wyatt claims that he picked up the wooden plank to remove it from the area for safety

reasons but did not pass it along to be thrown.

Wyatt remembers picking up the sprayer. After someone showed him how to use it, Wyatt pulled the trigger and pointed the sprayer into open space. He said, after the fact, he couldn't believe that he had done that. After Wyatt ascended to the Lower West Terrace, he neared the "tunnel," where he saw "real violence" used against law enforcement. After that, as Wyatt remained on Capitol grounds, he helped hang a "TRUMP 2020" flag on the inaugural stage. He claimed that he only helped because someone asked him. Although Wyatt realized that he should have left Capitol grounds, he said it was easier to stay than to leave.

## III.    THE CHARGES AND PLEA AGREEMENT

On July 7, 2023, Wyatt was charged by Information with violating 18 U.S.C. § 111(a)(1) and (b), for Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, that is, oleoresin capsicum ("OC") spray. On September 8, 2023, Wyatt pleaded guilty pursuant to a plea agreement to Count One of the Information charging him with a violation of 18 U.S.C. § 111(a)(1) and (b).

## IV.    STATUTORY PENALTIES

Wyatt now faces sentencing on 18 U.S.C. § 111(a)(1) and (b). As noted by the Plea Agreement and the Presentence Report issued by the U.S. Probation Office, Wyatt faces up to twenty years' imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, and a mandatory special assessment of $100. Draft PSR ¶ 4.[4]

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

---

[4] To date, the final PSR has not been issued. Thus, all references to the PSR in this memorandum refer to the Draft PSR, ECF No. 48.

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).   The Probation Office calculated the combined offense level of the count of conviction as 26, with an adjusted offense level as 23, as set forth below. PSR ¶¶ 31-42.

Count One: 18 U.S.C. § 111(a)(1) and (b)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 2A2.2(b)(2)(B) | Dangerous Weapon | +4 |
| U.S.S.G. § 2A2.2(b)(3) | Convicted under 111(b) | +2 |
| U.S.S.G. § 3A1.2 | Official Victim | +6 |
| **Total Offense Level:** | | **26** |
| Acceptance of responsibility (U.S.S.G. §3E1.1) | | <u>-3</u> |
| **Adjusted Offense Level:** | | **23** |

That calculation is consistent with the parties' stipulations in their plea agreement. *See* ECF 45 at ¶ 6(A).

Recent amendments to the Sentencing Guidelines for 2023, which went into effect on November 1, 2023, include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. Section 4C1.1 was not considered at the time the parties entered into the plea agreement. It does not impact Wyatt's guidelines calculations.

Section 4C1.1 does not apply in this case because Wyatt used violence when he sprayed police officers with a chemical irritant. *See* U.S.S.G. § 4C1.1(a)(3) (providing that the adjustment for zero-point offenders only applies if "the defendant did not use violence or credible threats of violence in connection with the offense"). Section 4C1.1 does not apply in this case for the additional reason that Wyatt possessed a dangerous weapon, that is, chemical irritant, as

acknowledged in his plea agreement. *See* U.S.S.G. § 4C1.1(a)(7) (providing that the adjustment for zero-point offenders only applies if "the defendant did not possess . . . [a] dangerous weapon (or induce another participant to do so) in connection with the offense").

Additionally, Wyatt threatened violence as he stood at the front of the pack of rioters confronting police officers, wrestled away a bike rack from officers, and surged forward as officers retreated to safety. Wyatt also facilitated violence – which ultimately led to bodily injury – when he passed the wooden 4" x 4" plank to his stepson, who then hurled at it and struck one of the officers, seriously injuring him.

The government is aware of several cases in which courts have rejected the application of § 4C1.1 to January 6 defendants who engaged in violence. *E.g.*, *United States v. Gundersen*, 21-cr-137 (RC), *United States v. Baquero*, 21-cr-702 (JEB), *United States v. Dillard*, 23-cr-49 (JMC).

The U.S. Probation Office calculated Wyatt's criminal history as category I, which is not disputed. PSR ¶ 48. Accordingly, based on the government's calculation of Wyatt's total adjusted offense level, after acceptance of responsibility, at 23, Wyatt's Guidelines imprisonment range is 46 to 57 months' imprisonment. Wyatt's plea agreement contains an agreed-upon Guidelines range calculation that mirrors the calculation contained herein.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Wyatt's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from

being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. The nature and circumstances of Wyatt's offense were of the utmost seriousness, and fully support the government's recommended sentence of 52 months of incarceration.

B.     **Wyatt's History and Characteristics**

Wyatt is reportedly employed with a remodeling company. PSR ¶¶ 78-79. In his past, Wyatt has had several instances of charged criminal conduct, including disorderly conduct in public, PSR ¶ 44; misrepresentation of age, PSR ¶ 45; and three instances of unlawful possession of a controlled substance, PSR ¶¶ 46, 47, 52 – the most recent charge in 2001. He has had two traffic infractions, including driving a motor vehicle on the highway without the required license. PSR ¶ 50. Wyatt has a history of drug and alcohol abuse. PSR ¶¶ 71-72.

Wyatt was not cooperative with the Probation Office during the referral for the presentence report. He did not authorize the release of records pertaining to his employment, educational history, substance abuse and/or mental health history. PSR ¶ 55. Wyatt also failed to provide financial information to the Probation Office. PSR ¶ 86.

Wyatt's history and characteristics weigh in favor of a lengthy term of incarceration.

### C.       The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Wyatt assaulted federal officers with a dangerous weapon when he sprayed a steady stream of chemical irritant at all officers within range – even after he witnessed repeated violence against officers. Wyatt handed a wooden plank to his co-defendant, which the latter immediately hurled against the police officers, injuring one of them. Wyatt repeatedly berated officers as they were assaulted by other rioters. And he tore away a bike rack from the officers, creating a vulnerability in the police line and making the police even more susceptible to attack. Wyatt's belligerent criminal conduct on January 6 was the epitome of disrespect for the law.

### D.       The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[5] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration. Wyatt was the antithesis of a peaceful protestor on January 6, 2021. He willfully joined a violent mob storming the Capitol. He engaged

---

[5] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

in assaultive acts with a dangerous weapon against police officers carrying out their duties, he aided other rioters in doing the same, and he consistently berated police officers along the way.

Further, Wyatt has yet to express any remorse regarding his conduct on January 6, 2021. For example, in October 2023, when a different defendant charged for his conduct on January 6 posted a reference on social media to "people [who] pled guilty to committing violence [but] who DID NOT commit violence," Wyatt responded, "#Metoo" with a hand-raised emoji. Even recently, Wyatt has consistently posted statements on social media about the "stolen" 2020 election, the illegitimacy of the prosecutions of people charged for their conduct on January 6, 2021, and January 6 being a "set up."

Wyatt's continued failure to acknowledge the gravity of January 6, in addition to his continued belief that the events of that day were a "set up" and that he's being unfairly prosecuted for his criminal conduct on that day demonstrates that the sentence must be sufficient to deter Wyatt from committing future crimes of violence in response to election results that he does not agree with.

### E.      The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity

courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider . . . the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Daniel Leyden*, 21-cr-314 (TNM), Sent. Hrg. Tr. at 38 ("I think the government rightly points out generally the best way to avoid unwarranted sentencing disparities is to follow the guidelines.") (statement of Judge McFadden); *United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("[A]s far as disparity goes, . . . I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of

sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[6]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[7]

---

[6] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[7] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Hazard*, 22-cr-117 (RDM), the defendant, like Wyatt, pleaded guilty to a single count of violating 18 U.S.C. § 111(b). Hazard approached the police line on the West Front of the Capitol grounds. Hazard was in the same crowd as Wyatt that forced its way through the police line near the Northwest Staircase. On the staircase, Hazard grabbed one officer and pulled him down the stairs, causing bodily injury. Hazard then returned to the West Front – next to Wyatt – and approached officers attempting to maintain the bike rack barricade. Hazard berated officers at the front of the line as other rioters attacked the officers. Hazard, like Wyatt, raised both of his middle fingers towards the police line and yelled "We're patriots, motherfucker!" In the same area and at the same time as Wyatt, Hazard then joined the mob in surging forward towards the police line. As he did, Hazard, like Wyatt, sprayed chemical irritant at officers, contributing to the fall of the police line – just feet away from Wyatt. Unlike Wyatt, Hazard later entered the Capitol building.

This Court sentenced Hazard to 57 months of incarceration. Like Hazard, Wyatt contributed to an officer's bodily injury when Wyatt handed his co-defendant a wooden plank that was hurled at officers, ultimately hitting one officer in the head. Also like Hazard, Wyatt joined in

---

BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

the same attack on the police line on the West front, which ultimately led to the retreat of officers; Wyatt sprayed chemical irritant at police officers; and Wyatt berated officers as other rioters attacked them. Wyatt did not pull an officer down the stairs like Hazard. Thus, a comparable, but a somewhat lesser sentence is warranted for Wyatt.

In *United States v. Lucas Denny*, 22-cr-70 (RDM), the defendant also pleaded guilty to a single violation of 18 U.S.C. § 111(b). For weeks leading up to the January 6, 2021 attack on the United States Capitol, Denney, a former military police officer and the self-declared President of a militia group called the Patriot Boys of North Texas, gathered protective gear and weapons, recruited comrades in arms, and arrived in Washington, D.C. eager for violence. On January 6, Denney joined the storming of the police lines on the West Plaza and Northwest Staircase of the U.S. Capitol, deployed pepper spray in the direction of officers, assaulted them – including with a pole – and attempted to disarm them. He then made his way to the Lower West Terrace of the Capitol building brandishing a baton or a stick and joined in the mob's efforts to push their way through a line of police officers, including by pushing a riot shield into the officers, and shortly thereafter, swung at a police officer who had been separated from the police line. He lied to FBI agents about his knowledge of the assault and deleted information from a social media account. This Court sentenced Denny to 52 months of incarceration.

In *United States v. Jorden Mink*, 21-cr-25 (RDM), the defendant also pleaded guilty to a violation of 18 U.S.C. § 111(a) and theft of government property in violation of 18 U.S.C. § 641. The defendant joined the riotous crowd near the Lower West Tunnel, then climbed onto an exterior window ledge of the Capitol building armed with a baseball bat. Mink repeatedly struck a window with the bat, causing it to shatter, then entered the Capitol through the window and removed chairs,

which he handed to other rioters. He then assaulted police officers in the Lower West Terrace, by spitting on them, throwing items at them, and repeatedly striking them with a flagpole. This Court sentenced Mink to 51 months' incarceration.

Finally, in *United States v. Therres*, 22-cr-381 (JEB), Wyatt's stepson, who also pleaded guilty to violating one count of 18 U.S.C. § 111(b), was sentenced by Judge Boasberg to 40 months of incarceration. Wyatt and Therres largely acted in concert on January 6. While on the West Front, Wyatt and Therres worked their way to the front of the mob and faced the outnumbered police line. The pair watched as rioters continuously attacked officers. Wyatt aided Therres by passing him a wooden plank, which Therres threw at the police line, causing bodily injury to an officer. After the police line fell, both Wyatt and Therres stole sprayers from MPD duffle bags and used them to spray chemical irritant at officers. Therres' guidelines calculation was higher than Wyatt's, because Therres had a more significant criminal history. Unlike Therres, however, Wyatt pulled away a bike rack barrier from the police line, causing a vulnerability in the police line and subjecting officers to immediate attack. Significantly, Therres was twenty-three years old on January 6, 2021. Wyatt, on the other hand, was a few months shy of his forty-eighth birthday. Although Therres was an emancipated adult on January 6, he likely looked to his step-father for guidance during the riot. Wyatt's guidance for the younger man was to act very aggressively towards the police, topped off by Wyatt handing Therres a piece of lumber that Therres launched at the police while Wyatt watched, apparently with approval.

Additionally, unlike Therres, Wyatt has not expressed remorse for his actions or accepted the gravity of the events of January 6. Wyatt has continued to publicly deny his role in the riot and continued to pursue the false narrative that the election was stolen and January 6 was a "set up."

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[8] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Wyatt must pay $2,000 in restitution, which reflects in part the role Wyatt's played in the riot on January 6.[9] Plea Agreement at ¶ 13. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,881,360.20" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other

---

[8] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[9] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

governmental agencies as of October 2022. *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.) Wyatt's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 110.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 52 months' incarceration, 3 years of supervised release, the agreed upon $2,000 in restitution, and a mandatory $100 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


BY:     /s/ *Ashley Akers*
        Trial Attorney
        MO Bar No. 69601
        United States Attorney's Office
        District of Columbia
        601 D Street NW
        Washington, D.C. 20001
        Phone: 202-353-0521
        Email: Ashley.Akers@usdoj.gov
